IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| THE GATHERING SPOT, LLC,<br>    Plaintiff,<br><br>v.<br><br>THE GATHERING SPOT AT BURLINGTON<br>VILLAGE, LLC and TERRI CADE-HILL,<br>    Defendants. | CIVIL ACTION FILE NO.<br>3:22-cv-00007-TRM-JEM<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

The Gathering Spot, LLC, ("TGS"), respectfully submits this Memorandum in Support of its Motion for Summary Judgment against Defendants The Gathering Spot at Burlington Village, LLC ("TGS Burlington") and Terri Cade-Hill, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

TGS is a widely popular private membership club. TGS was founded in 2016 as a members-only, private social club in Atlanta that features a restaurant and event space designed to provide its members with opportunities to socialize, experience cultural events, and collaborate professionally. (Joint Appendix ("*JA*") at p. 4 [Verified Complaint ¶¶ 10-11]). [1]

Among many of its service offerings, TGS offers restaurant and bar services and event space for private events such as weddings, concerts, and conferences. (*Id.*) TGS's members are dispersed across the United States and have access to each of the club's locations in Washington, D.C., Atlanta, and Los Angeles, as well as its affiliate locations in Charlotte, New York City,

---

[1] Plaintiff verified its Complaint, as set forth in Joint Appendix page 36. Accordingly, Plaintiff cites to its Complaint as evidence herein.

Houston, Detroit, and Chicago. (*JA.* at p. 1.) Its membership roster is filled with celebrities, creatives, politicians, and many other successful and well-known executives and entrepreneurs. (*JA.* at p. 4 [Verified Complaint ¶ 13]).

TGS first began using the name "THE GATHERING SPOT" in commerce when it opened its flagship location in Atlanta in January 2016. (*JA* at p. 5 [Verified Complaint ¶ 19]). On October 4, 2016, TGS registered "THE GATHERING SPOT" with the United States Patent and Trademark Office under Registration No. 5,123,588 for "Concierge services for others, namely, making requested personal arrangements and reservations, running errands, and providing customer-specific information to meet individual needs" in International Class 45. (*JA* at pp. 5, 18-19). Additionally, on January 17, 2017, TGS was also granted a federal trademark registration for THE GATHERING SPOT under Registration No. 5,053,536 for the following services: "Social club services, namely, arranging, organizing, and hosting social events, get-togethers, and parties for club members" in International Class 41 and "Providing food and drinks; bar and cocktail lounge services; providing conference rooms; restaurant and catering services; providing social meeting, banquet and social function facilities" in International Class 43. (*JA* at pp. 5, 20-21). These registrations and Plaintiff's common law rights will collectively be referred to as "Plaintiff's Marks".

Since at least January 30, 2016, until present, TGS has used the mark "THE GATHERING SPOT" in commerce in connection with the associated services. (*JA* at p. 5 [Verified Complaint ¶ 19]). TGS's trademarks have been in continuous use for over five years and have achieved widespread public recognition and developed acquired distinctiveness from the frequent sponsorship of events, concerts, debates, and conferences. (*JA* at p. 5 [Verified Complaint ¶ 20]).

Since its inception, TGS has continued to gain acclaim and notoriety through its high-profile members and guests, and by hosting events such as TED Talks, seminars, workshops, professional networking events, and political fundraisers. (*JA* at p. 1.) TGS and/or its founders have been featured in FOOD & WINE magazine, the Los Angeles Sentinel, The Georgetowner, Creative Loafing, NBC News, CBS 46, The New York Times, ESSENCE magazine, Atlanta Business Chronicle, VARIETY (magazine), Metro Atlanta Chamber, Atlanta Magazine, INC (magazine), WIRED (magazine), The Atlanta Journal Constitution, USA TODAY, Fast Company, Nightly News with Lester Holt, NewsOne, FORBES, Bloomberg Businessweek, Black Enterprise, BILLBOARD, and many others. (*JA* at p. 5 [Verified Complaint ¶ 22]). In nearly six years since its beginning, TGS now owns four federal trademark registrations for "THE GATHERING SPOT" or "TGS" with unsurpassed goodwill in its brand. (*JA* at pp. 18-25).

On the morning of November 4, 2016, Defendant Terri Cade-Hill visited TGS's Atlanta location as a guest and met Ryan Wilson, the cofounder of TGS. (*JA* at pp. 6, 27-28). Upon visiting TGS's Atlanta location, Ms. Cade-Hill had access to every aspect of TGS's operation, an opportunity to view the club's set-up, organizational arrangement, and see the success of the TGS business model firsthand. (*JA* at pp. 6, 42 [Verified Complaint ¶ 26; RFA No. 8]). Shortly after her visit, Ms. Cade-Hill emailed Mr. Wilson asking for anything that could assist her in opening a shared working space in Knoxville, TN, specifically resources related to financing and creating the structure and technology. (*JA* at pp. 7, 43 [Verified Complaint ¶ 27; RFA No. 9]). Mr. Wilson provided Ms. Cade-Hill with information related to the resources he used to secure financing and an offer to continue discussions related to her Knoxville space. (*JA* at p. 28). Unfortunately, at that time, Mr. Wilson did not know Ms. Cade-Hill would go on to create a competing business that was a mirror image of TGS, copying everything down to the name.

In June 2019, Ms. Cade-Hill and TGS Burlington opened an event space in Knoxville. (*JA* at pp. 6, 42 [Verified Complaint ¶ 24; RFA No. 7]). Defendants adopted the name "THE GATHERING SPOT," typically used alongside the phrase "at Burlington Village." (*JA* at pp. 6-10 [Verified Complaint ¶¶ 26-33, 36-37]). Defendants admit that they developed the idea for the name as a derivative of Plaintiff's business. (*JA* at p. 43 [RFA No. 10]). The opening announcement is shown below:



(*JA* at p. 7 [Verified Complaint ¶ 29]). Mr. Wilson immediately informed Defendants that their business infringed upon TGS's federal trademark rights and that they must immediately stop using the mark. (*JA* at pp. 8-9 [Verified Complaint ¶ 32]).

At some point, like TGS, Defendants also began promoting themselves as a restaurant as well. (*JA* at p. 7 [Verified Complaint ¶ 30]). Defendants ignored Mr. Wilson's messages, (*JA* at p. 9 [Verified Complaint ¶ 33]), and then proceeded to also ignore a cease and desist letter sent by Plaintiff's counsel. (*JA* at pp. 9, 34-35 [Verified Complaint ¶ 33]). Defendants continued to use the mark "The Gathering Spot" after being asked to cease use by Plaintiff. (*JA* at p. 43 [RFA

4

Case 3:22-cv-00007-TRM-JEM   Document 55-1   Filed 07/05/23   Page 4 of 16
PageID #: 427

No. 13]). Moreover, in subsequent advertising, Defendants began dropping use of "at Burlington Village" such that the geographical differentiator was gone, leading to an even more confusing mark. (*JA* at pp. 9, 43 [Verified Complaint ¶ 34; RFA Nos. 12, 14]). Defendants also used the mark "G SPOT" in marketing, which tarnishes TGS, and which Defendants admit is a reference to an erogenous zone in a woman's body. (*JA* at pp. 10, 44 [Verified Complaint ¶ 35; RFA Nos. 19, 20]). Despite receiving numerous communications from TGS asking Burlington TGS to rebrand, it refused to do so. (*JA* at pp. 8-10, 43 [Verified Complaint ¶¶ 32-35; RFA No. 13]). Accordingly, TGS initiated this action for trademark infringement, unfair competition, and dilution under the Lanham Act, 15 U.S.C. §§ 1116, 1125(a), 1125(c); and trademark infringement and dilution by tarnishment under Tennessee law on January 5, 2022. In the months after filing its lawsuit, TGS would attempt service on Defendants more than 23 times, ultimately leading to an entry of default against Defendants and an Order granting Plaintiff's request for more than $27,000 in attorneys' fees for Defendants' willful evasion of service.

On September 19, 2022, the Court entered an Order establishing that Defendants' Answer was deemed filed. On April 6, 2023, Plaintiff served upon Defendant TGS Burlington its First Interrogatories, First Request for Production of Documents, and First Requests for Admissions. (*JA* at p. 48, 51 [Hyland Declaration ¶ 5]). To date, Defendant(s) have failed to respond to any of Plaintiff's written discovery requests, including its Requests for Admission. (*JA* at p. 48 [Hyland Declaration ¶ 6]). Defendants have also failed to provide Plaintiff with their initial disclosures or witness list.

5

# ARGUMENT AND CITATION OF AUTHORITY

## I. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). While the Court views the evidence in a favorable light for the non-moving party, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348; 89 L. Ed. 2d 538 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001), "the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims." *Hopkins v. Sellers*, Case No. 1:09-cv-304, U.S. Dist. LEXIS 58980, 9-10 (E.D. Tenn. Jun. 2, 2011) (citing *Celotex*, 477 U.S. at 324). "It is well established that once the party moving for a Rule 56 summary judgment has met its burden, the non-moving party cannot rest on its pleadings to avoid a summary judgment but must go beyond the pleadings and by some evidence -- such as affidavits -- designate specific facts which would preclude the entry of summary judgment for the moving party." *Newman-Waters v. Blue Cross/Blue Shield of Tenn., Inc.,* 2005 U.S. Dist. LEXIS 27394, 76-77 (2005)(citing *Celotrex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986)). If the Court determines that the factfinder could not find in favor of the non-moving party based on the record, the Court should grant summary judgment. *Id*. at *10 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505; 91 L. Ed. 2d 202 (1986)).

## II. No Facts are in Dispute as to Trademark Infringement

Here, as a matter of law, Defendants have infringed Plaintiff's invaluable rights in its trademark which have caused ongoing and irreparable harm to Plaintiff and the goodwill associated with Plaintiff's marks.

A claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, requires a plaintiff to show "(1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion." *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 621 (E.D. Tenn. 2012) (citing to *Abercrombie & Fitch v. Fashion Shops of Ky., Inc.*, 363 F. Supp. 2d 952, 957 (S.D. Ohio 2005)). Further, if a plaintiff establishes infringement and additionally alleges trademark counterfeiting, he must also show that "the defendant intentionally used the mark knowing it was a counterfeit, as the term counterfeit is defined in 15 U.S.C. § 1116." *Id.* Section 1116 defines counterfeit mark as "a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." "Elsewhere, the statute provides additional clarification, defining 'counterfeit' as 'a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.'" *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 425 (6th Cir. 2010) (quoting 15 U.S.C. § 1127).

The first two elements of trademark infringement are undisputed in this case. Plaintiff's federal registration constitutes prima facie evidence of the validity of its legally protectable mark:

> Any registration . . . of a mark registered on the principal register . . . and owned by a party to an action shall be . . . prima facie evidence of registrant's exclusive

7

right to use the registered mark in commerce on the goods or services specified in the registration . . . but shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a); *see also Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 676 F. Supp. 813, 815 (E.D. Tenn. 1987). Here, TGS has asserted four trademark registrations in the mark "THE GATHERING SPOT", (*JA* at pp. 18-25), that have not been contested by Defendants. Plaintiff's trademarks are therefore valid and protectable.

The second element requires a showing that Defendants used TGS's trademark in commerce without Plaintiff's consent. The record here is undisputed that Defendants opened an event space and dining establishment using the mark "THE GATHERING SPOT" (*JA* at pp. 7-8, 42 [Verified Complaint ¶¶ 29-31; RFA No. 6]), that they promoted their business in interstate commerce[2] (*JA* at pp. 7, 9-10 [Verified Complaint ¶¶ 29, 30, 34, 35]), and that they did so without TGS's consent (*JA* at pp. 10, 42-43 [Verified Complaint ¶ 36; RFA Nos. 2, 3, 5, 13]).

As to the third element, "[t]he touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). Courts consider the following eight factors when determining whether the mark is likely to cause confusion: "(1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines." *Abercrombie*, 363 F. Supp. 2d at 959 (citing *Frisch's Rests, Inc. v. Elby's Big Boy of*

---

[2] The internet is "an instrumentality of interstate commerce." *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 622 (E.D. Tenn. 2012) (citing to *Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research,* 527 F.3d 1045 (10th Cir. 2008)).

*Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982)). However, "such multi-factored balancing is unnecessary in cases like this one where the defendant has misappropriated precise counterfeits of the plaintiff's trademarks on goods that compete with the trademark holder's own goods." *General Motors Corp. v. Autovation Technologies, Inc.*, 317 F. Supp. 2d 756, 761 (E.D. Mich. 2004). In such cases, "a likelihood of confusion is presumed when a defendant intentionally copies a trademark design 'with the intent to derive a benefit from the reputation of another.'" *Id.* (quoting *Ford Motor Corp. v. Lloyd*, 22 F. App'x 464, 467 (6th Cir. 2001)).

Here, it is undisputed that Defendants adopted a precise counterfeit of TGS's trademark for services that directly overlap with TGS's services. (*JA* at pp. 9-10, 42 [Verified Complaint ¶¶ 34-39; RFA Nos. 6-8]). Likelihood of confusion should therefore be presumed.

Even if the Court were to engage in the multi-factor analysis, likelihood of confusion would be clearly established. Plaintiff has established that it has a strong, well-known mark (*JA* at pp. 4-6, 42 [Verified Complaint ¶¶ 11-16; 21-23]), the parties' services are overlapping (*JA* at pp. 7-8, 10, 42 [Verified Complaint ¶¶ 30, 37; RFA Nos. 6, 7]), the marks are identical (*JA* at pp. 7-9 [Verified Complaint ¶¶ 30, 31, 34]), the parties both use similar marketing channels (*JA* at p. 7 [Verified Complaint ¶ 30]), Defendants have admitted to intentionally copying TGS's trademarks and business model (*JA* at pp. 42-43 [RFA Nos. 8, 10, 16, 17]), and have admitted that consumer confusion has occurred (*JA* at p. 43 [RFA No. 18]). Because most, if not all, of the likelihood of confusion factors weigh in favor of finding likelihood of confusion, trademark infringement exists as a matter of law.

### III. No Facts are in Dispute as to Unfair Competition

Plaintiff also set forth a claim for unfair competition under 15 U.S.C. § 1125(a). Claims under § 1125(a) are governed by the "same test" as trademark infringement actions. *Audi AG v.*

9

*D'Amato,* 469 F.3d 534, 542 (6th Cir. 2006). Because TGS has established trademark infringement, it also has established its unfair competition claim.

### IV. No Facts are in Dispute as to Trademark Dilution

TGS also has established as a matter of law that Defendants diluted TGS's trademark as prohibited in 15 U.S.C. § 1125(c). In order to establish trademark dilution, TGS must show that its trademark is (1) famous and (2) distinctive, and that Defendants' use of the mark (3) was in commerce, (4) began after TGS's mark became famous, and (5) likely caused dilution of the distinctive quality' of TGS's mark." 15 U.S.C. § 1125(c).

TGS easily satisfies the first two factors. (*JA* at p. 6 [Verified Complaint ¶ 22]). For reasons discussed above, Defendants' use of the mark was "in commerce." Defendants admit they began using the mark in 2019, well after TGS's mark became famous (*JA* at pp. 6, 42 [Verified Complaint ¶ 24; RFA Nos. 7-8]). Thus, the chief question on this claim is whether Defendants caused "dilution of the distinctive quality' of TGS's mark." However, with respect to this factor "the Supreme Court has noted that 'direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence—the obvious case is one where the junior and senior marks are identical.'" *Moseley v. V. Secret Catalogue*, 537 U.S. 418, 434, 123 S. Ct. 1115, 155 L. Ed. 2d 1 (2003)). Here, the marks in this case are identical, and indeed intended to be indistinguishable.

Moreover, this case additionally presents uncontested evidence of tarnishment. Actionable trademark dilution from "tarnishing occurs when a trademark is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *Scooter Store, Inc. v. SpinLife.com, LLC*, No. 2:10-cv-18, 2012

U.S. Dist. LEXIS 140003, at *41 (S.D. Ohio Sep. 28, 2012). "[A]ny new mark with a lewd or offensive-to-some sexual association raises a strong inference of tarnishment. The inference must be overcome by evidence that rebuts the probability that some consumers will find the new mark both offensive and harmful to the reputation and the favorable symbolism of the famous mark." *V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382, 389 (6th Cir. 2010). Here, Defendants have referred to their business as "GSPOT," including as a social media "handle" (*JA* at pp. 10, 44 [Verified Complaint ¶ 35; RFA Nos. 19, 20]) creating precisely the type of unfavorable sexual associations referenced in *V Secret Catalogue*, and they have provided nothing to rebut the presumption that such use is offensive or harmful. Dilution by tarnishment has therefore been established.

### V. No Facts are in Dispute as to Permanent Injunctive Relief

Pursuant to Section 34 of the Lanham Act, Courts are empowered to "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). Permanent injunctive relief is appropriate when (1) the plaintiff risks suffering irreparable harm; (2) monetary remedies are inadequate to compensate for the plaintiff's injury; (3) the balance of hardships favors the plaintiff; and (4) the public interest would not be disserved by an injunction. eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).

The Court should grant permanent injunctive relief as requested in the Verified Complaint, because all factors strongly favor Plaintiff. Plaintiff fully and adequately pled the grounds for, and their entitlement to, a permanent injunction against the Defendants in the

Verified Complaint. With regard to the equitable factors: (1) Plaintiff will lose control over the reputation and goodwill of its trademark, continuing to suffer irreparable harm if the injunction is not granted; (2) injunctive relief is necessary to halt Defendants' continued infringement of Plaintiff's valuable trademark rights; (3) the requested injunction would only prevent Defendants from engaging in unlawful behavior; (4) Plaintiff has no other recourse against Defendants if an injunction is not granted; and (5) an injunction would protect against public confusion. *See Philip Morris,* 219 F.R.D. at 502 ("Failure to grant the injunction would needlessly expose the Plaintiff to the risk of continuing irreparable harm").

Accordingly, Plaintiff requests the following permanent injunction be entered:

> An injunction ordering Defendants, and their officers, directors, members, agents, servants, employees, and attorneys, and all other persons acting in concert or participating with them (the "Enjoined Parties"), who receive actual notice of the injunction order by personal or other service, to cease all use and never use the THE GATHERING SPOT mark, or any other names or marks likely to cause confusion with the Plaintiff's Marks, in connection with social club services, providing food and drinks; bar and cocktail lounge services; providing conference rooms; restaurant and catering services; banquet and social function facilities, or any other related good or service, and including any such use on websites or social media.

### VI. Statutory Damages

The Lanham Act permits a plaintiff to elect "to recover, instead of actual damages . . . an award of statutory damages" of not less than $1,000 and not more than $200,000 per counterfeit mark offered for sale or distribution, "as the court considers just." 15 U.S.C. § 1117(c). Despite requesting such information, TGS has not received any documentation of Defendants' profits, and therefore hereby elects statutory damages.

Where the infringement is willful, the Lanham Act provides for enhanced statutory damages up to $2 million per counterfeit mark. *Id.* § 1117(c)(2). Failure to defend is evidence of

willfulness. *Philip Morris USA, Inc. v. Castworld Prods., Inc*., 219 F.R.D. 494, 500 (C.D. Cal. 2003).

"A defendant's continued infringement after notice of his wrongdoing is probative evidence of willfulness." *Anthony Vince Nail Spa, Inc. v. M Vince Spa, L.L.C.,* No. 3:21-cv-00366, 2021 U.S. Dist. LEXIS 213537, at *13 (M.D. Tenn. Nov. 4, 2021) (citing *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 880 (S.D. Ohio 2007)). Here, Defendants visited TGS's business and asked its founder for advice prior to adopting the same trademark (*JA* at pp. 6-7 [Verified Complaint ¶¶ 25-28]), continued to use the infringing mark after being put on notice (*JA* at pp. 8-9 [Verified Complaint ¶ 32-33]), encroached on TGS's Marks in an even more direct and aggressive manner after receiving cease & desist notices (*JA* at p. 9 [Verified Complaint ¶ 34]), evaded service in a manner that this Court has already found to be willful [Dkt. 53], defaulted [Dkt. 30, 31], and failed to respond to any discovery (*JA* at p. 48 [Hyland Declaration ¶¶ 5-6]). These uncontroverted facts support a finding of willfulness.

In light of Defendants' knowledge of TGS's Marks, their aggressive and deliberate misuse of those marks after being put on notice of infringement, their failure to provide any defense, and their use of that mark broadly across numerous platforms, an award at the higher end of the spectrum could be plausible. Nonetheless, TGS recognizes that Defendants are not exceedingly well funded, and therefore TGS suggests that an award of $250,000 is appropriate.

## VII. Exceptional Case

TGS seeks a ruling from the Court that this case constitutes an "exceptional case" under 15 U.S.C. § 117(a) and an award of its attorney's fees. "District courts 'determine whether a case is exceptional in the case-by-case exercise of their discretion, considering the totality of the circumstances.'" *Daycab Co. v. Praire Tech., LLC*, No. 3:20-CV-63-TRM-DCP, 2023 U.S.

Dist. LEXIS 72251, at *14 (E.D. Tenn. Jan. 27, 2023) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014). "The use of the word 'exceptional' limits the district court's discretion by reserving attorney's fees for 'rare' or 'unusual' cases." *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 478 (6th Cir. 2022), *reh'g denied*, No. 20-3598, 2022 U.S. App. LEXIS 22271, 2022 WL 3237492 (6th Cir. Aug. 10, 2022) (citation omitted). This case is both "rare" and "unusual."

Ms. Cade-Hill visited The Gathering Spot as a guest at the Atlanta location on November 4, 2016, where she met with its founder and CEO, Ryan Wilson. (*JA* at p. 6 [Verified Complaint ¶ 25]). On the same morning of her visit, Ms. Cade-Hill emailed Mr. Wilson asking for assistance with finding the money and creating the structure and technology for a shared working space she was developing in Knoxville, TN. (*JA* at p. 6 [Verified Complaint ¶ 26]). She then opened a replica business under the same name, clearly intending to duplicate TGS and to ride off of its goodwill. Moreover, Defendants dropped use of the geographic indicator "at Burlington Village" *after receiving cease & desist notifications.* (*JA* at p. 10 [Verified Complaint ¶ 34]).

Not only does this case present exceptional facts of the underlying infringement, but Defendants have engaged in dilatory, bad-faith tactics that have unreasonably created expense and hassle for TGS. As set forth more fully in Plaintiff's Brief in Support of Motion for Default Judgment, [Dkt. 32-1], Defendants willfully evaded service and defaulted, only to reappear with no intent to participate in this case.

In light of Defendants' willful infringement, evasion of service, initial default, and failure to respond to discovery, this case is exceptional. TGS will submit its fees and supporting affidavits if the Court determines that this case is exceptional.

## CONCLUSION

For the foregoing reasons, TGS respectfully requests that its motion for summary judgment be granted, statutory damages be awarded, and this case be declared an "exceptional case" under 15 U.S.C. § 117(a) and award Plaintiff its attorney's fees.

Respectfully submitted this 5th day of July, 2023.

*/s/ Amanda G. Hyland*
Micheline K. Johnson
Tennessee Bar No. 013847
Amanda G. Hyland (*admitted pro hac vice*)
Georgia Bar No. 325115
Paige E. McKinney *(admitted pro hac vice)*
Georgia Bar No. 926474
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Fax: (770) 434-7376
mkjohnson@taylorenglish.com
ahyland@taylorenglish.com
pmckinney@taylorenglish.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| THE GATHERING SPOT, LLC,<br>  Plaintiff,<br><br>v.<br><br>THE GATHERING SPOT AT BURLINGTON<br>VILLAGE, LLC and TERRI CADE-HILL,<br>  Defendants. | )<br>)<br>)<br>)<br>) CIVIL ACTION FILE NO.<br>) 3:22-cv-00007-TRM-JEM<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I hereby certify that on this July 5, 2023, I electronically filed the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record:

David H. Dupree
Tennessee Bar No. 025120
P.O. Box 6622
Knoxville, TN, 37914
(865) 332-5140
attydupree@aol.com

This 5th day of July, 2023.

                 */s/ Amanda G. Hyland*
                 Amanda G. Hyland (*pro hac vice*)
                 Georgia Bar No. 325115